### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| HARBOR SIDE GRILL, LLC, | | |
| *d/b/a* Latitude 38°, | * | |
| DOCK ANN, LLC, | | |
| DOCK ANNA DECK, LLC | * | |
| | | |
| *Plaintiffs*, | * | |
| | | |
| v. | * | Civil Action No. RDB-26-0714 |
| | | |
| CITY OF ANNAPOLIS, | * | |
| THE WHITING TURNING | | |
| CONTRACTING COMPANY | * | |
| | | |
| *Defendants*. | * | |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

## <u>MEMORANDUM OPINION</u>

Since 2015, Plaintiff Harbor Side Grill, LLC, doing business as "Latitude 38°", has operated its restaurant near the waterfront at 12 Dock Street in Annapolis, Maryland ("the City"). In recent years, this waterfront area has suffered from increased flooding, which has cost small businesses and the City millions of dollars in lost revenue and repair costs. In 2019, the City initiated the Annapolis City Dock Resiliency Project ("Project") to address this flooding problem. The Project includes plans to elevate land above flood levels and convert existing parking areas into a pedestrian plaza that can filter stormwaters. More recently, there have been public meetings involving the Annapolis Planning Commission and the Historic Preservation Commission. In 2025, the City's private contractor began construction work for the Project.

Unfortunately, this long-term effort has had an immediate negative impact on the Latitude restaurant.  Placement of fencing by the private contractor on the sidewalk in front of the restaurant has resulted in a significant decrease in net sales and the cancellation of reservations.  On February 20, 2026, Plaintiffs Harbor Side Grill, LLC ("Latitude"); Dock Ann, LLC; and Dock Anna Deck, LLC (collectively with Dock Ann, "Landlord Plaintiffs") filed a two-Count Complaint against the City of Annapolis and its private contractor, Whiting Turner Contracting Company ("Whiting Turner") (collectively, "Defendants"), alleging (1) a 42 U.S.C. § 1983 claim for Violation of the Takings Clause of the Fifth Amendment to the United States Constitution (Count I); and (2) a Maryland common law claim of private nuisance (Count II).  (ECF No. 1.)  That same day, Plaintiffs also filed a Motion for Temporary Restraining Order and Preliminary Injunctive Relief (ECF No. 2), requesting that this Court order a change in the placement of the fencing.  Quite simply, the Fifth Amendment to the U.S. Constitution, incorporated against the states by the Fourteenth Amendment to the U.S. Constitution, prohibits the government from depriving an individual of property without due process and without just compensation.

This constitutional claim requires a detailed analysis with respect to deprivation of private property and the possibility of compensation.  However, the Plaintiffs face a heavy burden in seeking immediate preliminary injunctive relief.  Such relief is an extraordinary remedy that requires Plaintiffs to satisfy four particular factors.  Those are: (1) they are likely to succeed on the merits of at least one of their claims; (2) they are likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities inures in their favor; and (4) the requested relief is in the public interest.  Accordingly, this Court scheduled an expedited

preliminary injunction hearing on Monday, March 2, 2026.  After extensive testimony from witnesses at the hearing, which lasted almost five hours, Plaintiffs have certainly established irreparable harm, and the balance of the equities and public interest favor relief.  Nevertheless, as set forth below, Plaintiffs have not established a likelihood of success on the merits of either of their claims.  For this reason, they have not demonstrated entitlement to the extraordinary remedy of preliminary injunctive relief, and their Motion must be DENIED.  This denial of injunctive relief is not a decision on the merits of the constitutional and state common law challenges in this case, and this litigation will proceed.

## BACKGROUND

This action arises from a construction fence erected during the ongoing Annapolis City Dock Resiliency Project ("Project"), which seeks to revitalize and protect the waterfront area in Annapolis, Maryland.  Ultimately, the Project will eliminate vehicle access to the waterfront along Dock Street and provide a pedestrian park that includes grade increases to protect businesses from flooding.  Since 2015, Plaintiff Harbor Side Grill, Inc., doing business as Latitude 38° ("Latitude"), has operated its restaurant in a building owned by Plaintiffs Dock Ann, LLC, and Dock Anna Deck, LLC (collectively "Landlord Plaintiffs") (collectively with Latitude, "Plaintiffs") at 12 Dock Street in Annapolis, Maryland, which directly abuts the Project area.  (ECF No. 1 ¶ 1 & n.1.)  Prior to initiation of the Project, Latitude boasted water views and easy parking for patrons in the public parking lot immediately in front of its entrance.  *See* (PE01; ECF No. 13-1).

In May 2025, Defendants City of Annapolis ("the City") and its general contractor Whiting Turner Contracting Company ("Whiting Turner") began construction for the Project

3

in the public parking lot in front of Latitude. (ECF No. 1 ¶ 13.) During this initial phase of construction, Defendants erected a temporary fence some distance from the sidewalk in front of Latitude. (*Id.* ¶ 13; PE03; ECF No. 13-1 at 3.) On or about October 20, 2025, however, Defendants constructed a more permanent fence directly abutting the entire length of the sidewalk in front of Latitude. (ECF No. 1 ¶¶ 16, 17; PE04; ECF No. 13-1 at 4.) Pursuant to construction plans, this fence will remain in place until at least June 2027. Since construction of the fence in October 2025, Latitude's net sales have decreased nearly 49 percent and patrons have repeatedly canceled reservations due to the construction. (ECF No. 1 ¶¶ 23, 19.) Before detailing the alleged events giving rise to the parties' dispute, the Court provides a brief overview of the involved property and the Project.

## I.    Latitude Restaurant & Property

Since 2015, Plaintiff Latitude has operated as a waterfront restaurant and event space in a building owned by Plaintiffs Dock Ann and Dock Anna Deck (collectively, "Landlord Plaintiffs")[1] at 12 Dock Street in Annapolis, Maryland. (ECF No. 1 ¶ 1 & n.1.) Latitude sits in a three-story building that offers both traditional restaurant seating and two separate event spaces on the second and third floors, which it rents out as banquet venues.[2] According to Latitude's Interim General Manager, Raymond Tompkins ("Mr. Tompkins"), it is one of the few spaces in Annapolis that can accommodate banquet parties of more than 100 people. The restaurant and banquet spaces have windows that look out at the Annapolis Harbor and a

---

[1] At the hearing, Landlord Plaintiffs' accounting manager or "outsourced Chief Financial Officer," Christopher Murrow, testified that Landlord Plaintiffs share some common ownership.

[2] Latitude's Interim General Manager, Raymond Tompkins, testified that these banquet spaces include: (1) the Ego Room, a carpeted space on the third floor of the restaurant that provides water views; and (2) an enclosed deck space on the second floor of the restaurant that also had water views prior to the onset of the Project.

small strip of water off the Harbor known as Ego Alley.  Prior to the onset of construction related to the Project, patrons could park in the large, public parking area in front of Latitude.  Similarly, they could easily walk to the water from Latitude by exiting the restaurant on foot and turning left to follow the sidewalk to the Harbor.

Latitude pays approximately $26,500 in rent to Landlord Plaintiffs each month, which constitutes Landlord Plaintiffs' sole income from the property at 12 Dock Street.   Landlord Plaintiffs presently have a collective mortgage amount of approximately $3 million on the 12 Dock Street property.  Pursuant to loan documents, if the ratio of Landlord Plaintiffs' income to their obligations to the lender falls beneath a certain threshold, the lender may sweep their bank accounts and, eventually, initiate foreclosure proceedings.  Apart from a brief downturn in business during the COVID-19 Pandemic, Latitude operated a successful and growing business between 2015 and May 2025.  Although the area is frequently subject to flooding, Latitude has never suffered water within the restaurant building because of its location on a slight ridge.  Nevertheless, its business is sometimes reduced during waterfront flood events when police close the waterfront area or divert traffic due to floodwater.  Mr. Tompkins stated that the restaurant often saw increased sales during holidays and City events such as the Annapolis Boat Show, and business in general was trending up in the last few years.

## II.    Annapolis City Dock Resiliency Project

In 2019, Defendant City of Annapolis ("the City") began to develop plans for the Annapolis City Dock Resiliency Project ("the Project") and retained The Whiting Turner

Contracting Company ("Whiting Turner") as designer and general contractor for the Project.[3] (ECF No. 11-3 at 2.)  In part, the Project seeks to protect waterfront businesses and buildings in Annapolis from flooding, which has cost small businesses and the City millions of dollars in repair costs and lost revenue in the past several years.  (ECF No. 11-3 at 2.)  Specifically, the Project includes plans to: (1) elevate land above flood hazard levels; (2) construct seawalls; (3) raise bulkheads; (4) install a stormwater management system and related infrastructure; (5) upgrade fire access routes and fire suppression systems; (6) convert existing parking into grass and plazas that can filter stormwater; (7) plant native vegetation, including trees; and (8) install bio-retention facilities, which the City has deemed "essential to protect the adjoining historic buildings, City streets, and public safety generally against ongoing nuisance flooding and recurring storm events . . . ."  (ECF No. 11-3 at 3.)  To facilitate the Project, the City and Project stakeholders obtained grants from the Federal Emergency Management Agency ("FEMA") and funding from the State of Maryland.  (ECF No. 11-3 at 2; ECF No. 12-5 at 1.)

**III.    Onset of Construction Work and Construction of Fences on Dock Street**

During the Project's planning phase, City planning boards and commissions hosted numerous public meetings, which they also recorded and posted online.  Throughout Spring 2024, the Annapolis Planning Commission and the Historic Preservation Commission continuously reviewed site plans for the Project.  (*Id.*)   Latitude's Interim General Manager, Mr. Tompkins, testified that he attended one or two of the public meetings about the Project, and he also watched some videos of the hearings.  He testified that these meetings publicized

---

[3]  The parties did not clearly adduce the date or terms of the contract between the City and Whiting Turner, but Whiting Turner's Senior Project Manager, Travis Ligon, testified that the contract included both design and general contracting.

the finished Project without identifying or communicating the potential hardships to businesses like Latitude. Mr. Tompkins testified that no City representatives affirmatively contacted Latitude to discuss the potential effects of the Project during this period. In 2025, after years of planning, Defendants finally commenced construction work for the Project in the public parking area immediately in front of Latitude.

As relevant to this litigation, in May 2025, Defendants first constructed a fence ("May Fence") some twenty feet back from the sidewalk in front of Latitude. In October 2025, however, they replaced the May Fence with a fence ("October Fence") that directly abuts the sidewalk in front of Latitude, creating an approximately two-hundred-foot walkway of fenced sidewalk that patrons must traverse to reach the restaurant's entrance. Presently at issue before this Court is whether Defendants should be required to move the October Fence back some twenty feet such that it is located at the same distance from Latitude as the May Fence. The below factual background details the construction of the May and October Fences, the grave effect of the October Fence on Latitude's business, Latitude's safety concerns as to the October Fence, and the construction scheduled to occur within the disputed twenty-foot area behind the October Fence.

### A.  Construction of Fencing

#### 1.  May Fence

In May 2025, Whiting Turner constructed a temporary fence ("May Fence") on Dock Street a distance from the sidewalk in front of Latitude. The May Fence reflected initiation of Phase 1A of the Project, which included only limited utility work. Mr. Tompkins described the May Fence as a sort of "racetrack" because it fenced off a circle in the middle of the

parking lot in front of Latitude while leaving open a wide lane around the edge of the lot. The May Fence was not bored into the asphalt but rather included a mesh or chain fence secured into temporary plastic barriers filled with water. It left sufficient room for a vehicle to drive up to the front of Latitude to drop off patrons, although parking was not permitted. *See* (PE02). The May Fence did not affect visitors' ability to access the water by following the sidewalk in front of Latitude to the waterfront. Mr. Tompkins testified that the construction of this fence coincided with a slight downturn or lull in Latitude's business, which was abnormal because it occurred just before Mother's Day and Commissioning Day at the United States Naval Academy. Those events typically produce significant business at Latitude. This downturn in business continued through summer 2025 until the Annapolis Boat Show ("Boat Show"), which occurred in late September or early October 2025.

Just before the Boat Show in fall 2025, Defendants removed the May Fence to reveal new pavement. Whiting Turner's Senior Project Manager, Travis Ligon ("Mr. Ligon"), testified that the removal of the May Fence at this time was not an accommodation for the Boat Show but rather reflected the natural progression of the planned construction. The Boat Show is typically a lucrative event for Latitude, which saw very successful sales during this period in which no fence was placed near the restaurant. For approximately one week after the Boat Show, there was no fence at the location.

### 2. October Fence

On or about October 20, 2025, in relation to the onset of Phase 1 of construction, Defendants constructed a more permanent fence ("October Fence") directly abutting the sidewalk in front of Latitude. The October Fence runs the entire length of the sidewalk in

8

front of Latitude before cutting across the sidewalk and blocking access to the water from the front of Latitude.  It also fully surrounds the Project area, thus fencing off a large portion of the City Dock up to the edge of the sidewalk in front of Latitude.  Mr. Tompkins testified that the fence is tall enough that it reaches the bottom of the second story of Latitude, thereby blocking view of the water from the first and part of the second floors of the building. Additionally, he explained that the fence prevents vehicle access to the front of Latitude entirely, leaving only the area behind the restaurant—which is used for Latitude employee parking, used grease storage, trash storage, food and supply delivery, and portable bathrooms and City dumpsters—open to vehicles.  Pedestrians can only reach the water by walking in this area behind the building.

Unlike the May Fence, the October Fence is more permanent and includes measures to secure it against vehicle collisions.  The Project's schedule envisions that the October Fence will remain in place until at least June 2027, if not later.  Mr. Ligon testified that the October Fence is driven into the asphalt to provide better impact control.  He explained that the May Fence was a temporary fence to prevent public access to utility work that was brief and limited in scope, while the October Fence will permanently prevent public access to heavy construction work, including multiple excavations over a 1.5-year period.  He testified that, given the breadth and significance of the excavation work set to occur in the area immediately behind the fence between October 2025 and June 2027, a temporary or moveable fence would not be best practice for public safety.

### B. Effect of Fence on Latitude's Business

The Plaintiffs contend that the construction of the October Fence harshly reduced Latitude's business such that the restaurant is now on the brink of financial failure. Specifically, Latitude's net sales have dropped by nearly 49% since the same period last year, which reflects a variance of approximately $40,000 less in sales per month. Put differently, Latitude's net sales between October 2025 and January 2026 were more than $120,000 less than its net sales during the same period the year prior. Latitude's financial consultant, Christopher Murrow ("Mr. Murrow"), explained that this sharp decrease in sales was notable because Latitude's sales had been trending upward since the COVID-19 Pandemic. These sales losses reflect a sharp decrease in both restaurant customers and banquet customers.

The Plaintiffs have proffered that customers have confirmed that the construction is responsible for the downturn in sales. Mr. Tompkins testified that pedestrians walking near the restaurant have told staff that it is a chore to get to the restaurant, it is difficult to find parking, and it is not clear that Latitude is open for business. He explained that customers have left reviews complaining about the construction and many customers have complained directly to Latitude staff. Moreover, clients have expressed concern at the sharply limited water view and lack of accessibility due to the October Fence. Mr. Tompkins explained that Latitude has lost numerous banquet reservations due to the October Fence. He explained that at least three or four banquet customers have paid their deposit to reserve the space only to cancel their reservation upon visiting in-person and seeing the fence line. Some of these customers explicitly cited the October Fence as the reason for their cancellation.

10

At present, Latitude employs approximately 30 people, many of whom are part-time workers. Mr. Tompkins explained that the restaurant is currently on a hiring freeze due to poor business even though it usually would begin to ramp up hiring for the summer season in March. He testified that some employees have acquired other jobs, while remaining employees express constant concern at the possibility of layoffs or closure of the business. He has begun conversations with his core staff regarding the need for layoffs, and he has begun to discuss the possibility of helping staff members find jobs elsewhere in the industry. According to Mr. Tompkins, the effect of the October Fence on Latitude is akin to daily flooding for a year. He further stated that Latitude has lost significant customer goodwill due to the perception that it is not open or is unable to provide its previous accessibility and water views, and he anticipates that such goodwill will prove difficult to recoup.

Mr. Tompkins explained that he has reached out to City and Whiting Turner personnel since the construction of the May and October Fences to discuss the impact of the construction work on Latitude's business. He testified that he received no communication from Defendants prior to construction of the October Fence, and he ultimately communicated with Adam Strott, a representative from the City's Economic Development Division, after the October Fence was constructed. Mr. Tompkins stated that after some of these communications, the City ordered and put up along the October Fence large banner signs directing visitors toward Latitude and informing them that the restaurant remains open during construction. He stated that these signs have not improved Latitude's business. He also acknowledged that the City has placed a new bus stop near Dock Street, but he testified that the bus stop has not resulted in improved foot traffic along Dock Street.

Mr. Tompkins and Plaintiffs also expressed concerns that the October Fence violates applicable Anne Arundel County Fire Code provisions and sharply limits vehicle access to the restaurant in case of an emergency. Plaintiffs retained mechanical engineer Brian Mills ("Mr. Mills") to evaluate the October Fence for any code violations. Mr. Mills explained that a portion of the fence along the sidewalk near the intersection of Dock Street and Craig Street narrows such that it violates applicable National Fire Prevention Code and Life Safety Code Provisions (collectively, "Fire Code"). (ECF No. 2-3 at 12–13.) Specifically, Mr. Mills testified that, based on the maximum occupancy of Latitude alone, the width of the means of egress leading to the public way[4] must be at least 79 inches. *See* (*id.* at 13). This minimum width of the means of egress is required by applicable Code provisions to prevent a bottleneck in the event of an emergency evacuation. He noted, however, that the October Fence narrows the sidewalk for a forty-five-foot portion of the walkway near the intersection of Dock Street and Craig Street to a means of egress only 60 inches wide, which violates § 14.8.3.1 of the National Fire Prevention Code. (ECF No. 2-3 at 12–13.) This code violation does not occur directly in front of Latitude but rather encompasses a forty-five-foot portion of the October Fence line near Craig Street.

At the preliminary injunction hearing, Mr. Ligon acknowledged that the October Fence narrows the sidewalk path in a manner that could be deemed in violation of the applicable Fire Safety codes. Although Defendants provided evidence that Whiting Turner walked the

---

[4] At the hearing, Mr. Mills explained that the public way by regulation must be at least ten feet wide, and the October Fence limits the width of the sidewalk area to some eight feet. Accordingly, whereas individuals could previously exit Latitude immediately into the public way on Dock Street, the October Fence's constriction of the width of the walkway in front of Latitude means that individuals must walk some 200 feet down the sidewalk until they reach the public way, which is now on Craig Street.

perimeter of the fence with the Annapolis Fire Marshal and provided weekly updates regarding emergency plans to Annapolis Fire Marshal personnel, (ECF No. 12-1 Ex. A), Mr. Ligon stated at the hearing that Whiting Turner intends to move the forty-five-foot portion of the October Fence that may be in violation of the Fire Code.  That is, Whiting Turner will remedy the code violation by moving some portion of the October Fence back approximately nineteen inches, and it will bear the cost of this adjustment to the fence line.

Separately, Mr. Tompkins testified that, in his experience, the restriction of vehicle access to the buildings along Dock Street has limited emergency vehicles' ability to reach portions of the block.  Due to the October Fence, there is no vehicle access to the front of the buildings on that portion of Dock Street unless the vehicles are able to travel behind the fence.  Mr. Tompkins testified that on Friday, February 27, 2026, he witnessed firefighters from a ladder truck walking on foot down the roadway at the rear of Latitude to reach a potential gas leak because the ladder truck's path to the leak was blocked by a large delivery truck and several personal vehicles.  Although Mr. Tompkins expressed concern for the safety of his staff and patrons, he testified that he has not made a formal complaint to Annapolis officials regarding restricted emergency access to Latitude.

### C.  Construction Occurring Behind October Fence in Front of Latitude

Based on these safety and economic concerns, Plaintiffs seek to require Defendants to move the October Fence line back twenty feet to the location of the May Fence.  Mr. Ligon testified that the twenty-foot area immediately behind the October Fence and in front of Latitude has already been subject to excavations in two Archaeological Areas of Investigation as required by the FEMA Programmatic Agreement related to the Project's FEMA grant.

Moreover, he explained that the same 20-foot area will see significant construction, including underground work such as: (1) construction of underground water lines; (2) construction of underground electrical lines; (3) construction of storm drains and an associated collection system; (4) underground stormwater filtration cells;[5] and (5) new ornamental retaining walls and foundations. (ECF No. 12-6 at 1; ECF No. 12-1 Ex. E.) Many of these features require protracted and extensive excavation of the ground in the entire twenty-foot patch of land immediately behind the fence and in front of Latitude. Additionally, the construction within that area will include above-ground elements such as light poles, new staircases, new ornamental trees, and brick pavers. By the end of the Project, that area will no longer be a roadway accessible to vehicles but rather a pedestrian park that includes stairway features.

The Project itself is valued at approximately $72 million, and Mr. Ligon estimated that the value of the work within the 20-foot area of land immediately behind the October Fence in front of Latitude is about $1.1 million. He asserted, however, that it would not be possible to complete the Project without the work occurring within that area of land. Additionally, Mr. Ligon testified that it would be very difficult, but perhaps possible to sequence the work in that 20-foot area behind the fence. He explained that sequencing would require further research given the complexity of the construction at issue and the need to complete subterranean elements in a specific order and with appropriate lateral spacing. He suggested that altering the sequencing of the construction could result in removal of the October Fence earlier than June 2027, but he was unable to provide a precise date. Additionally, he testified

---

[5] Mr. Ligon testified that some of these stormwater filtration cells are compliant with requirements from the Maryland Department of the Environment, such that altering the construction in certain ways could require further investigation to determine whether Project features remained compliant.

that use of a temporary fence would not be best practice, and use of temporary plating would not be possible given the scale of excavation required.

Finally, Mr. Ligon explained that the total cost to relocate the October Fence—including labor costs, movement of an erosion-sediment fence behind the October Fence, movement of the stabilized construction entrance, repaving the pavement disrupted in the movement process, and reconstructing the fence in a new location—would be approximately $210,000.  He explained, however, that moving the October Fence back twenty feet would disrupt the schedule of the Project significantly, likely causing additional delays and potentially placing the excavation work in violation of Maryland Department of the Environment regulations.  These delays would render Whiting Turner unable to meet the completion date of the Project, which, in turn, would cause it to owe the City of Annapolis liquidated damages pursuant to the Defendants' contract.  In sum, Mr. Ligon testified that the current location of the October Fence is necessary because it is not possible to complete the construction work planned for the 20-foot area behind the fence via trenching techniques, and using temporary fencing would be a "terrible idea" for public safety.

### D.  Procedural History

On February 20, 2026, Plaintiffs initiated this action by filing in this Court a two-Count Complaint (ECF No. 1) against City Defendant and Whiting Turner, as an agent of the City. It alleges against both Defendants: (1) a 42 US.C. § 1983 claim for violation of the Takings Clause of the Federal Constitution (Count I); and (2) a private nuisance claim under Maryland common law (Count II).  (ECF No. 1 at 10–12.)  In Count I, Plaintiffs allege that Defendants have deprived them of economically viable use of their property and investment-backed

expectations, including by rendering Latitude restaurant into a state of economic inutility such that Plaintiffs have no reasonable use of their property. (*Id.* ¶¶ 35–36.)  In Count II, Plaintiffs allege that the infringement on their use of the property has resulted in a decrease in net sales of nearly 49%, loss of goodwill, loss of customer trust, and, if permitted to continue, will cause employee layoffs and Plaintiffs' insolvency. (*Id.* ¶ 41.)  They also allege that Defendants' activity is in violation of City ordinances, which jeopardizes the health and safety of Plaintiffs' employees and invitees. (*Id.* ¶ 43.)

Also on February 20, 2026, Plaintiffs filed the pending Motion for Temporary Restraining Order and Preliminary Injunctive Relief (ECF No. 2) ("Plaintiffs' Motion").  In their Motion, Plaintiffs seek a preliminary injunction ordering that: (1) within three days of the entry of any court order, Defendants will move the October Fence a minimum of twenty feet away from Plaintiffs' property, and (2) the security requirement for preliminary injunctive relief under Federal Rule of Civil Procedure 65(c) should be waived. (ECF No. 2-4 at 2.)  On Wednesday, February 25, 2026, this Court held an off-the-record telephone conference with all parties and set a Motions Hearing to address Plaintiffs' Motion. *See* (ECF No. 7).  On March 2, 2026, this Court heard testimony from Mr. Tompkins, Mr. Mills, Mr. Murrow, and Mr. Ligon and oral argument from counsel for all parties.[6]  This matter is now ripe for review.

---

[6] After the conclusion of the hearing, Plaintiffs filed a Letter (ECF No. 18) in which they "propose[d] an interim solution" that involved granting their requested relief to move the October Fence back twenty feet but then directing the parties to participate in mediation before reporting back to this Court regarding the mediation efforts. (ECF No. 18 at 1.)  Defendants then filed an opposing Letter (ECF No. 19), in which they assert that mediation is not an appropriate form of relief under Rule 65 and Plaintiffs' request for such relief after the conclusion of the preliminary injunction hearing should not be considered. *See also* (ECF No. 20 (City of Annapolis Letter joining arguments in Whiting Turner's Letter at ECF No. 19)). Compelled mediation is not within the ambit of Rule 65 and was not included in the relief requested in Plaintiffs' Motion or at the hearing. Moreover, for the reasons set forth below, Plaintiffs have not established a likelihood of success on the merits of either of their claims.  Accordingly, this Court must deny preliminary injunctive relief and does not consider the additional relief requested in Plaintiffs' Letter (ECF No. 18).

**STANDARD OF REVIEW**

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). A preliminary injunction is an "extraordinary remed[y] involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1992)); *see also League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (explaining that a preliminary injunction may be characterized as either prohibitory, "aim[ing] to maintain the status quo," or mandatory, "alter[ing] the status quo," and noting the status quo has been defined for this purpose as "the last uncontested status between the parties which preceded the controversy" (quoting *Pashby v. Delia*, 709 F.3d 307, 319–20 (4th Cir. 2013))).

In determining whether to issue a preliminary injunction, the Court must follow the test set forth by the Supreme Court in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), which requires a showing that: (1) the movant is likely to succeed on the merits; (2) the movant is likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities favors the movant; and (4) an injunction is in the public interest. 555 U.S. at 20; *accord Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020). A court cannot issue a preliminary injunction unless "every factor is met." *Am. Fed'n of Teachers v. Bessent*, 152 F.4th 162, 169 (4th Cir. 2025) (quoting *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 544 (4th Cir. 2023)); *accord Pashby*, 709 F.3d at 320. "[T]he [p]laintiff bears the burden of establishing that each of these

factors supports granting the injunction." *Direx*, 952 F.2d at 812 (quoting *Tech. Publ'g Co. v. Lebhar-Friedman, Inc.*, 729 F.2d 1136, 1139 (7th Cir. 1984)). Thus, a court need not address all four *Winter* factors if one or more factors is not satisfied. *Henderson ex rel. NLRB v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018).

## ANALYSIS

### I.      Article III Standing

As an initial matter, Defendants challenge Landlord Plaintiffs' Article III standing to bring this action. *See* (ECF No. 12 at 2; ECF No. 11 at 3 n.1). Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. Art. III, § 2. "[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III" that gives meaning to these constitutional limits by "identify[ing] those disputes which are appropriately resolved through the judicial process." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). The "irreducible constitutional minimum" of Article III standing requires a plaintiff to "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc., v. Robins*, 578 U.S. 330, 338 (2016). "Article III standing is a fundamental, jurisdictional requirement that defines and limits a court's power to resolve cases or controversies." *In re Mut. Funds Inv. Litig.*, 529 F.3d 207, 216 (4th Cir. 2008). Accordingly, "[b]efore the Court considers the TRO motion, the Court must assure itself that the plaintiffs have standing . . . ." *Am. Fed'n of Teachers v. Bessent*, 765 F. Supp. 3d 482, 492 (D. Md. 2025).

18

Plaintiffs bear the burden of establishing standing, as they are "the party seeking to invoke federal jurisdiction." *Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002). When assessing standing, the Court "assumes the merits of a dispute will be resolved in favor of the party invoking . . . jurisdiction . . . ." *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 99 (4th Cir. 2011). In this case, Defendants argue that only Latitude has established a possessory property interest sufficient to give rise to an injury-in-fact for the purposes of Article III standing, while Landlord Plaintiffs have not sufficiently alleged any injury-in-fact.[7] (ECF No. 12 at 2–3.) Specifically, they contend that, under Maryland law, Landlord Plaintiffs have only a reversionary interest in the property via their lease with Latitude such that Landlord Plaintiffs remain entitled to rent payments regardless of the success of Latitude's business. (*Id.* at 2 (citing *Copinol Rest., Inc. v. N. Mkt., LLC*, 339 A.3d 873 (Md. 2025)).) Moreover, they appear to contend that Plaintiffs have not provided sufficient proof of lapsed rent payments to demonstrate economic harm as an injury in fact. (*Id.* at 3.)[8]

At this early stage of litigation in which the Court must assume that factual disputes will resolve in favor of Plaintiffs, *see Equity in Athletics, Inc.*, 639 F.3d at 99, Plaintiffs have demonstrated Article III standing. First, all Plaintiffs have established an actual and imminent injury-in-fact for the purposes of Article III standing. Latitude has established an injury-in-fact by alleging that it holds a valid possessory interest in the property and the October Fence

---

[7] Defendants do not challenge Latitude's Article III standing. (ECF No. 12 at 2 ("In this case, only the Plaintiff with a possessory interest in real property at issue can demonstrate standing.").)

[8] Defendants do not frame their standing argument under the language of Article III but instead assert that "[b]y complete absence of proofs, the Court must assume that the [L]andlord Plaintiffs continue to receive their rents and cannot demonstrate any harm that has flowed through the tenant's possessory interest, and to them." (ECF No. 12 at 3.) Based on this discussion of harm, this Court construes this argument to challenge only the "injury-in-fact" element of Article III standing, and Defendants raise no arguments as to causation or redressability.

has cost it customers, customer good will, and net sales such that it faces imminent closure of its business.  It has sufficiently alleged a concrete and particularized injury by alleging that it has already lost nearly 49% of its net sales and that it will soon need to conduct layoffs.  *See, e.g.*, *Md. Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 210 (4th Cir. 2020) ("[F]inancial harm is a classic and paradigmatic form of injury in fact." (quoting *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 760 (4th Cir. 2019)).

Similarly, Landlord Plaintiffs have established injury in fact at this early stage of litigation by alleging that their only source of income from the property is Latitude's rent payments, and they face imminent economic harm if Latitude fails to pay its rent.  *See Md. Shall Issue, Inc.*, 971 F.3d at 210; *Air Evac EMS, Inc.*, 910 F.3d at 760; *see also N. Mill St., LLC v. City of Aspen*, 6 F.4th 1216, 1229 (10th Cir. 2021) (concluding property owner had shown sufficient injury where it alleged that it could not build units needed to make property profitable under city's regulation); *Auracle Homes, LLC v. Lamont*, 478 F. Supp. 3d 199 (D. Conn. 2020) (declining to dismiss for lack of standing where landlord plaintiffs alleged Takings Clause violation based on injury from loss of ability to receive profits from enforcing rent contracts).[9] Although Defendants argue that Landlord Plaintiffs have not offered proof of their imminent financial losses, at this pleading stage this Court must assume factual disputes will resolve in Plaintiffs' favor.  *Equity in Athletics, Inc.*, 639 F.3d at 99.  In this case, Plaintiffs allege that "Latitude is in imminent danger of becoming insolvent, *an event of default under Plaintiffs' loan*

---

[9] Defendants' argument regarding Landowner Plaintiffs lack of cognizable injury for the purposes of standing appears to implicate Plaintiffs' various property interests at stake in this litigation.  To the extent Defendants argue that certain Plaintiffs lack the property interest required to raise a § 1983 claim for violation of the Takings Clause, such argument goes to such Plaintiffs' likelihood of success on the merits of Count I and, therefore, is discussed further below.

*documents . . . .*"  (ECF No. 1 ¶ 25.)  Thus, to the extent that Landlord Plaintiffs allege imminent default on loans as a result of the fence and its associated restriction of Latitude's net sales, they have alleged sufficient injury for Article III standing at this early stage.

Moreover, Plaintiffs have established the causation and redressability elements of Article III standing.  The traceability or causation element of Article III standing requires "'a causal connection between the injury and the conduct complained of' by the plaintiff."  *Air Evac EMS*, 910 F.3d at 760 (quoting *Lujan*, 504 U.S. at 560).  In short, a plaintiff must be able to show that the defendant's conduct, "as opposed to the 'independent action of some third party not before the court'" caused the injury.  *Id.* at 760 (quoting *Frank Krasner Enters., Ltd. v. Montgomery Cnty.*, 401 F.3d 230, 234 (4th Cir. 2005)).  In this case, Plaintiffs have shown that Defendants' construction of the October Fence sharply decreased Latitude's sales, rendering them on the verge of significant layoffs, closure of their business, and inability to make required rent payments to Landowner Plaintiffs.  Finally, Plaintiffs have shown that the requested injunctive relief would likely redress their injury by restoring pedestrian and vehicle accessibility and returning water views to their May 2025 status.  Specifically, they have alleged that the May Fence caused moderate reductions in their business but did not produce the same severe financial losses they have endured since construction of the October Fence.[10] Accordingly, Plaintiffs have satisfied the traceability and redressability elements of standing at this early stage of litigation.

---

[10]  Plaintiffs have sufficiently alleged that the May Fence caused financial damages that undergird their claims in this case overall, but they explained on the record that their request for preliminary injunctive relief is based solely on the October Fence.

## II.    Plaintiffs' Motion for Preliminary Injunctive Relief (ECF No. 2)

Plaintiffs seek a preliminary injunction ordering Defendants to move the October Fence back at least twenty feet from the sidewalk in front of Latitude such that the fence line returns to where it was in May 2025.  (ECF No. 2-1.)   As explained above, to establish entitlement to such preliminary injunctive relief, Plaintiffs must satisfy each of the four factors elucidated in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008).  *See Am. Fed'n of Teachers v. Bessent*, 152 F.4th 162, 169–70 (4th Cir. 2025) (quoting *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 544 (4th Cir. 2023)).  Specifically, they must show (1) likelihood of success on the merits of at least one of their claims; (2) that they are likely to suffer irreparable harm absent preliminary relief; (3) that the balance of equities inures in their favor; and (4) that the requested relief is in the public interest.  *Winter*, 555 U.S. at 20.  In this case, where Defendants include the government, the third and fourth *Winter* factors merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  After extensive testimony from witnesses at the preliminary injunction hearing, Plaintiffs have certainly established irreparable harm, and the balance of the equities and public interest favor relief.  Nevertheless, as set forth below, Plaintiffs have not established a likelihood of success on the merits of either of their claims.  For this reason, they have not demonstrated entitlement to the "extraordinary remed[y]" of preliminary injunctive relief, and their Motion must be denied.  *Direx Israel, Ltd.*, 952 F.2d at 816.

### A. Likelihood of Success on the Merits

### 1. Count I: 42 U.S.C. § 1983 Claim for Violation of the Takings Clause of the Fifth Amendment

To prevail under § 1983, a plaintiff must show "(1) deprivation of a right secured by the constitution or federal statute; (2) by a person; (3) acting under color of state law."[11] *Campbell v. Florian*, 972 F.3d 385, 392 n.5 (4th Cir. 2020) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).  As relevant to the first element of the § 1983 claim at issue in this case, the Takings Clause of the Fifth Amendment to the United States Constitution, incorporated against the states by the Fourteenth Amendment, prohibits the government from depriving an individual of "private property . . . for public use, without just compensation."  U.S. CONST. amend. V; *see also Student "A" v. Hogan*, 513 F. Supp. 3d 638, 646 (D. Md. 2021).  "The Takings Clause is 'designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole' by requiring just compensation when private property is taken for public use." *Yawn v. Dorchester Cnty.*, 1 F.4th 191, 194 (4th Cir. 2021) (quoting *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 31 (2012)).  To raise a takings claim, a plaintiff must have "a constitutionally protected property interest," including a "legitimate claim of entitlement" to the property.  *Student "A"*, 513 F.

---

[11]  In this case, there is no real dispute that the City of Annapolis and Whiting Turner are "persons" for the purposes of a § 1983 claim and that Whiting Turner acted under color of state law as an agent of the City when it erected the October Fence.  A city may be held liable under § 1983 when it or its agents takes unconstitutional action "pursuant to official municipal policy of some nature" and there is a direct causal link between the policy and the constitutional deprivation.  *Todman v. Mayor & City Council of Balt.*, 104 F.4th 479, 495 (4th Cir. 2024) (quoting *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)).  Plaintiffs allege that construction of the fence occurred pursuant to Whiting Turner's contract with the City.  Like the parties, therefore, this Court focuses its analysis on the first element of a Section 1983 claim.

Supp. 3d at 646 (quoting *Horne v. Mayor & City Council of Balt.*, 349 F. App'x 835, 838 (4th Cir. 2009)).

A governmental taking of property may be physical or regulatory. *Md. Shall Issue*, 963 F.3d at 364. As Judge Gallagher of this Court has explained, physical takings occur "when the government physically invades or appropriates property." *Willowbrook Apartment Assocs., LLC v. Mayor & City Council of Balt.*, 563 F. Supp. 3d 428, 439 (D. Md. 2021). "Regulatory takings, on the other hand, fall into two categories": (1) *per se* takings, and (2) all other regulatory takings. *Id.* A *per se* taking occurs where a regulation *either* deprives the property owner of "*all* economically beneficial uses" of property, *or* "requires an owner to suffer 'permanent physical occupation.'" *Id.* (first quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992); and then quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982)). The second type of regulatory taking involves all other regulations and is "subject to the *ad-hoc* multi-factor balancing test announced in the Supreme Court's landmark decision in *Penn Central Transportation Company v. City of New York*, 438 U.S. 104 (1978)." *Willowbrook Apartment Assocs.*, 563 F. Supp. 3d at 439. Under the *Penn Central* balancing test, courts seek "to determine whether the regulation 'goes too far,' such that it effects a taking for which just compensation is required." *Id.* Specifically, courts must consider "(1) 'the economic impact of the regulation on the claimant'; (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations'; and (3) 'the character of the governmental action.'" *Blackburn v. Dare Cnty.*, 58 F.4th 807, 812 (4th Cir. 2023) (quoting *Penn Cent.*, 438 U.S. at 124). In this case, Plaintiffs argue that the October Fence constitutes a regulatory taking under the

24

factors elucidated in *Penn Central*.[12]  At this preliminary stage, however, Plaintiffs have not shown that they will likely be able to satisfy each of the three *Penn Central* factors.

As an initial matter, Plaintiffs have not clearly identified the property right that they claim to be disrupted by the October Fence.  Latitude's alleged damages appear to be based entirely on economic losses stemming from reduced patronage of the restaurant and non-economic damage in the form of lost customer goodwill, but Latitude has not alleged or asserted any property right in operating a successful restaurant at the 12 Dock Street location. Indeed, courts have rejected the notion that economic losses based on regulations that affect customers' willingness to patronize a business implicate a cognizable property right for the purposes of an asserted violation of the Takings Clause.  *See, e.g.*, *Gammoh v. City of La Habra*, 395 F.3d 1114, 1122 & n.4 (9th Cir. 2005) (explaining plaintiffs—including the owner of a dancing establishment and several dancers—failed to identify a protected "property interest" in Takings Clause challenge to city ordinance requiring "adult cabaret dancers" to remain two feet away from patrons during performances).  Nor do Plaintiffs appear to assert any property right to the view of the water or accessibility to Latitude.[13]  Relatedly, Landowner Plaintiffs do not assert any property right in the operation of a restaurant at the 12 Dock Street property they own.  Although they assert that their loan documents include a stress test provision that compares income to obligations owed, they do not provide any loan documents or clearly assert that they have any property interest in the operation of Latitude as a restaurant.[14]  Even

---

[12]  Plaintiffs have not alleged any physical invasion of their property.  Indeed, all parties agree that the October Fence at issue is entirely on City property, and Plaintiffs do not own the sidewalk in front of Latitude.
[13]  Even if Plaintiffs intended to assert a claim based on reduced accessibility, the October Fence is not on Plaintiffs' property and Latitude remains accessible via the sidewalk in the front and the roadway in the rear.
[14]  Because Plaintiffs did not provide any loan documentation or any lease agreement between Latitude and Landowner Plaintiffs, the Court draws its understanding of the relationship of the parties and the requirements

so, ownership of property is a recognized property right for the purposes of a claimed violation of the Takings Clause.  Ultimately, however, even assuming all Plaintiffs could establish a sufficient infringed property interest to allege a violation of the Takings Clause, they have not shown that they are likely to succeed on the merits of such claim.

First, at this early stage, Plaintiffs have not alleged a diminution in property value or economic impact that is significant enough to constitute a taking under the first *Penn Central* factor.  As Chief Judge Russell of this Court has explained, "courts have found no regulatory taking when presented with diminutions in value of 75% and 92.5%."  *Clayland Farm Enters., LLC v. Talbot Cnty.*, Civ. No. GLR-14-3412, 2019 WL 4116631, at *8 (D. Md. Aug. 29, 2019) *aff'd* 987 F.3d 346 (4th Cir. 2021) (citing *Henry v. Jefferson Cnty. Comm'n*, 637 F.3d 269, 277 (4th Cir. 2011)).  Indeed, the U.S. Court of Appeals for the Fourth Circuit has suggested that an 83% diminution in value is not sufficient to establish a taking under the first *Penn Central* factor. *See Pulte Home Corp. v. Montgomery Cnty.*, 909 F.3d 685, 696 (4th Cir. 2018).  In this case, Plaintiffs have not clearly alleged a diminution in value of the property, but they have demonstrated an approximately 49% diminution in net sales.  (ECF No. 1 ¶ 19; PE05; PE08.)  Even assuming such diminution in net sales may be considered as an economic impact under the first *Penn Central* factor, it is not significant enough to weigh in favor of a taking.  *See, e.g.*, *Pulte Home Corp.*, 909 F.3d at 696.  Moreover, Plaintiffs continue to operate Latitude at the property and, even if they elect not to continue such operation, "[a] regulation is not a taking merely because it 'prohibit[s] the most beneficial use of the property.'"  *Quinn v. Bd. of Cnty. Comm'rs*, 862 F.3d

---

of the mortgages encumbering the 12 Dock Street property from the testimony of Plaintiffs' "outsourced Chief Financial Officer," Mr. Murrow.

433, 442 (4th Cir. 2017) (quoting *Penn Cent.*, 438 U.S. at 125). Accordingly, Plaintiffs have not shown a likelihood of success of establishing a taking under the first *Penn Central* factor.

Second, Plaintiffs have not established that they are likely to show that Defendants' conduct "has interfered with distinct investment-backed expectations" to the degree required to establish a regulatory taking under *Penn Central*. *Blackburn*, 58 F.4th at 813 (quoting *Penn Cent.*, 438 U.S. at 124). Generally, "[t]hese expectations must be founded 'on a preexisting property right'" and "must be reasonable given the current use of the property." *Id.* (quoting *Clayland Farm Enters., LLC v. Talbot Cnty.*, 987 F.3d 346, 354 (4th Cir. 2021)). Some courts have found that existing restaurants have reasonable investment backed expectations in continued operation of their business. *See, e.g.*, *TJM 64 Inc. v. Harris*, 475 F. Supp. 3d 828, 838–39 (W.D. Tenn. 2020) (determining restaurant owners had investment backed expectations in continued operations of restaurants where they faced significant economic danger from COVID-19 regulations barring in-person service). Additionally, a restriction that alters the use of a property after a purchaser has taken possession is more likely to disrupt reasonable, investment backed expectations. *See, e.g.*, *Anaheim Gardens, L.P. v. United States*, 953 F.3d 1344, 1350–51 (Fed. Cir. 2020) (discussing consideration of timing of regulation under second *Penn Central* factor). Where a regulation limits but does not bar use of a property in the manner in which it was previously used, however, the Fourth Circuit has suggested that the interference is not significant. *Blackburn*, 58 F.4th at 813 (concluding interference with vacation home not significant where COVID-19 regulation required homeowners to arrive by March 20, 2020 in order to use it); *see also Everest Foods Inc. v. Cuomo*, 585 F. Supp. 3d 425, 444 (S.D.N.Y. 2022) (finding second factor disfavored takings claim based on COVID-19 restrictions where

27

plaintiff-restaurants opened restaurants before COVID-19 because restaurants are routinely subject to health regulations *and* were permitted to continue operations under the regulation).

In this case, the construction of the October Fence does not directly regulate in any way the use of the property at 12 Dock Street as a restaurant. Instead, Plaintiffs argue that the fence has reduced pedestrian traffic and stripped the property of its accessibility and water views in a manner that has severely reduced its business. Plaintiffs have operated Latitude since 2015, well before the initiation of the Project and construction of the October Fence in 2025. At this early stage of litigation, therefore, they have certainly shown some degree of interference from Defendants' actions to the extent the October Fence reduces patrons' access to the restaurant. Nevertheless, the October Fence does not directly regulate the use of the property as a restaurant in any manner. Moreover, Defendants have placed banner signs and a new bus stop intended to draw business to Latitude during the construction, which indicates that Defendants have permitted Latitude to continue operating during construction and disfavors any finding of a taking under the second *Penn Central* factor. *See Blackburn*, 58 F.4th at 813; *Everest Foods, Inc.*, 585 F. Supp. 3d at 444. Accordingly, Plaintiffs have not established at this early stage that they are likely to satisfy the second *Penn Central* factor.

Finally, Plaintiffs have not shown that they are likely to establish a taking under the third *Penn Central* factor, which considers the character of the restriction at issue. The Fourth Circuit has deemed this factor "a little fuzzy" and explained that courts treat it as "an open-ended inquiry into whatever considerations they think are most relevant in each specific case." *Blackburn*, 58 F.4th at 813. The third *Penn Central* factor invites courts to evaluate whether the result of the regulation at issue is "functionally equivalent to the classic taking in which the

government directly appropriates private property or ousts the owner from his domain." *Id.* at 814 (quoting *Lingle v. Chevron USA, Inc.*, 544 U.S. 528, 539 (2005)). The Fourth Circuit has made clear that courts should consider "the distributional impact of the" regulation because a regulation "is more problematic when it burdens only a small number of property owners." *Id.* (citing *Armstrong v. United States*, 364 U.S. 40, 49 (1960)). Where the regulation limits the use of other nearby parcels, however, it is less likely to be a taking under the final *Penn Central* factor. *Id.* at 815 (citing *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415–16 (1922)). Notably, under this third factor, "[i]nterference with property is less likely to be considered a taking when it 'arises from some public program adjusting the benefits and burdens of economic life to promote the common good.'" *Clayland Farm Enters.*, 987 F.3d at 355 (quoting *Quinn*, 862 F.3d at 443); *see also Penn Cent.*, 438 U.S. at 124.

In this case, the October Fence is not functionally equivalent to an appropriation of property or an ouster. First, there has been no physical transfer of property, which precludes any finding of appropriation. *Blackburn*, 58 F.4th at 814 (citing *Horne v. Dep't of Agric.*, 576 U.S. 350, 361–62 (2015)). Second, Plaintiffs remain in control of their property and able to operate it such that the effect of the regulation is not similar to ouster. *See id.* (explaining that owners' continued control of and access to home despite regulation suggest regulation is not "functionally equivalent" to ouster). Moreover, the October Fence affects all the properties along that block of Dock Street, *see* (PE03, PE04, PE01, ECF No. 12 Ex. E), and such limitations of nearby properties disfavors finding a taking in this case. *Blackburn*, 58 F.4th at 813. To the extent that the Project will renovate the waterfront area to the benefit of all businesses in downtown Annapolis, Plaintiffs and their immediate neighbors bear a

disproportionate burden in the form of the October Fence and construction immediately in front of their properties.  While nearby business owners will reap the benefits of a revitalized downtown Annapolis area, they do not have to suffer the prolonged period with a tall, opaque fence immediately in front of their property.  Even considering this disproportionate burden, however, Plaintiffs have not shown at this early stage that they are likely to demonstrate that the character of the October Fence is similar to a physical appropriation or ouster from property.  In sum, at this early stage of litigation, Plaintiffs have not shown that they are likely to demonstrate that the October Fence constitutes an unconstitutional regulatory taking.

### 2.  Count II: Private Nuisance

"Under Maryland law, an action lies in private nuisance where a defendant substantially interferes with plaintiff's use and enjoyment of his or her property."  *Adams v. NVR Homes, Inc.*, 193 F.R.D. 243, 251 (D. Md. 2000) (citing *Exxon Corp. v. Yarema*, 516 A.2d 990 (Md. Ct. Spec. App. 1986)).  "Private nuisance is 'a nontrespassory invasion of another's interest in the private use and enjoyment of land.'"  *Poppleton Now Cmty. Ass'n, Inc. v. La Cite Dev't, LLC*, Civ. No. ABA-24-2420, 2025 WL 1707254, at *13 (D. Md. June 17, 2025) (quoting *Rosenblatt v. Exxon Co.*, 642 A.2d 180, 190 (Md. 1994)).  Maryland recognizes both a nuisance *per se* and a nuisance "in fact."  *Blue Ink, Ltd. v. Two Farms, Inc.*, 96 A.3d 810, 820 (Md. Ct. Spec. App. 2014).  "'A nuisance *per se* is an act, occupation, or structure which is a nuisance at all times and under any circumstances regardless of location or surroundings[,]' whereas '[a] nuisance in fact is an act, occupation, or structure . . . which becomes a nuisance by reason of circumstances, location, or surroundings.'"  *Id.* (quoting *Adams v. Comm'rs of Trappe*, 102 A.2d 830, 834 (Md. 1954)).  In this case, Plaintiffs allege a nuisance in fact in Count II because they

allege that the October Fence is a nuisance given their operation of Latitude at the 12 Dock Street property.

To establish a nuisance in fact, a plaintiff must show two elements: (1) that the defendant's activity was an unreasonable and substantial interference with the plaintiff's use and enjoyment of land; and (2) that the plaintiff's asserted harm is objectively reasonable. *Blue Ink, Ltd.*, 96 A.3d at 821. Importantly, the Supreme Court of Maryland has suggested that

> [W]here expensive works have been erected and carried on, which are useful and needful to the public, *persons must not stand on extreme rights*, and bring actions in respect of every trifling annoyance, otherwise, business could not be carried on in such places. But still, if the result of the trade or business thus carried on is such as to *interfere with the physical comfort, by another, of his property, or such as to occasion substantial injury to the property itself*, there is a wrong to the neighboring owner for which an action will lie.

*Id.* (emphasis in original) (quoting *Susquehanna Fertilizer Co. v. Malone*, 20 A. 900, 902 (Md. 1890)). Generally, a plaintiff alleging private nuisance based on diminution of property value must also allege "an attendant disturbance of the property's use and enjoyment." *Poppleton New Cmty. Ass'n*, 2025 WL 1707254, at *13.

### i. Whether Defendants' Conduct is an Unreasonable and Substantial Interference

At this preliminary stage, Plaintiffs have not shown that they are likely to demonstrate the first element of private nuisance. Under Maryland law, a "[t]he disturbance of the property interest must be 'substantial and unreasonable . . . such as would be offensive or inconvenient to the normal person." *Id.* (quoting *Wash. Suburban Sanitary Comm'n v. CAE-Link Corp.*, 622 A.2d 745, 750 (Md. 1993)). Significantly, this element focuses on the damage to the plaintiff without regard for the negligence, intent, or fault of the party producing the asserted nuisance. *Wash. Suburban Sanitary Comm'n*, 622 A.2d at 750, 758 (collecting cases and rejecting assertion

that private nuisance liability depends on defendant's intent).  Actions that do not diminish the market value of a property may only be a nuisance if a plaintiff can show substantial "discomfort and annoyance." *Poppleton Now Cmty. Ass'n*, 2025 WL 1707254, at \*13 (citing *Wash. Suburban Sanitary Comm'n*, 622 A.2d at 750).  In this case, Plaintiffs have not alleged any diminution in the market value of their property,[15] so they must establish that the interference at issue "is substantial and unreasonable and such as would be offensive or inconvenient to the normal person." *Wash. Suburban Sanitary Comm'n*, 622 A.2d at 750.  Typically, such a showing requires evidence of extreme disturbances to the use and enjoyment of property, often, though not necessarily, including physical intrusions.  *See Blue Ink, Ltd.*, 96 A.3d at 820 (recognizing that nuisance covers intangible invasions like odor and that plaintiff need not demonstrate physical injury from the nuisance); *Poppleton Now Cmty. Ass'n, Inc.*, 2025 WL 1707254, at \*13 (collecting cases); *Wash. Suburban Sanitary Comm'n*, 622 A.2d at 750 ("[T]he complained of interference must cause actual physical discomfort and annoyance to those of ordinary sensibilities, tastes, and habits . . . ."); *Gallagher v. H.V. Pierhomes, LLC*, 957 A.2d 628, 639 (Md. Ct. Spec. App. 2008) (declining to find nuisance based on construction project's pile driving in the Inner Harbor because disturbance "was reasonable in time, place, manner, and duration and did not substantially interfere with [plaintiff's] use and enjoyment of her land").  Even where a nuisance does not result in physical harm to real property, a plaintiff may be able to show substantial interference by establishing "more than modest adjustments to their

---

[15]  Plaintiffs offer no allegations as to the value of the property but instead assert financial damages based on Latitude's loss of net sales.  Indeed, as Defendants noted on the record, the Project improvements will ultimately likely increase the value of the property at 12 Dock Street by protecting the area from flooding and installing a pedestrian park immediately in front of the property.

use of their real property" based on the alleged nuisance. *Exxon Mobil Corp. v. Albright*, 71 A.3d 30, 96 (Md. 2013).

In this case, Plaintiffs have not alleged any diminution to the market value of their property *or* any physical harms associated with the October Fence. Thus, their asserted interference as to their nuisance claim is limited to (1) reduced accessibility and water views; and (2) the sharp diminution in net sales since construction of the October Fence and the attendant risk that they will soon go out of business. Plaintiffs have shown that the October Fence has severely disrupted their ordinary and reasonable operation of Latitude as an accessible restaurant with water views. They have shown that the fence sharply reduces accessibility to the front of the restaurant by eliminating vehicle access to the area and instead requiring patrons to traverse a 200-foot corridor of sidewalk abutted by the opaque October Fence before they can reach Latitude's front door. Similarly, Plaintiffs have shown that the fence blocks the view of the water from Latitude's first floor. Although these allegations may ultimately be sufficient to establish substantial interference with use and enjoyment of property, at this early stage of litigation Plaintiffs have not shown a likelihood of success on the merits of this prong of their nuisance claim.

Although some courts have suggested that business losses may constitute substantial interference with use and enjoyment of property, there appear to be no cases holding that purely economic damages to a business constitutes substantial interference.[16]    *Cf. Blue Ink,*

---

[16]  Indeed, no parties to this case have identified any cases recognizing a nuisance based purely on damages to a business. *See Echard v. Kraft*, 858 A.2d 1018, 1022–23 (Md. Ct. Spec. App. 2004) (explaining "Maryland's rule . . . that to be actionable the interference must materially diminish the value of the property as a dwelling *and* seriously interfere with the occupier's use and enjoyment of it"). Rather, most cases in which courts have recognized a nuisance have involved at least some allegations of interference with enjoyment of property beyond mere monetary losses. *See, e.g., Taylor v. City of Baltimore*, 99 A. 900 (Md. 1917) (finding nuisance where

*Ltd.*, 96 A.3d at 825 (declining to find nuisance and noting that court did not believe asserted nuisance "will substantially impact [plaintiff's business's] continuing vitality . . . ."); *Nissan Motor Corp. v. Md. Shipbuilding & Drydock Co.*, 544 F. Supp. 1104, 1118–19 (D. Md. 1982) (acknowledging economic harm to business but suggesting it was not substantial enough to constitute substantial interference for purposes of nuisance claim); *Albright*, 71 A.3d at 98–99 (noting jury found nuisance liability where chemical leak caused business owner to have to use water bottles and noise related to nuisance caused her to lose customers). Indeed, Maryland courts have recognized that "mere diminution of property value, in the absence of a demonstrable tortious injury, is not sufficient to support a cause of action for nuisance." *Albright*, 71 A.3d at 95 (citing *Exxon Corp. v. Yarema*, 516 A.2d 990, 1004 (Md. Ct. Spec. App. 1986). At this early stage of litigation, therefore, Plaintiffs have not established that they are likely to demonstrate a substantial and unreasonable interference with use and enjoyment of their property.[17]

---

city constructed a sewage plant adjacent to plaintiff's hotel, which resulted in "horrible, sickening, and disease-breeding stench, which at all hours of the day and night permeates the atmosphere around the plaintiff's said property . . ." and which depreciated the value of plaintiff's property); *Bishop Processing Co. v. Davis*, 132 A.2d 445 (Md. 1957) (finding nuisance based on "stifling and choking" odor on property); *Albright*, 71 A.3d at 95 (collecting cases rejecting nuisance claims where asserted damages were only reputational without physical injury); *Nat'l Fair Housing All. v. Bank of Am., N.A.*, 401 F. Supp. 3d 619, 644 (D. Md. 2019) (declining to dismiss nuisance claim where plaintiffs alleged defendant's action caused basement flooding, infestation of rats next to the property, squirrels in plaintiff's attic, and unsightly disrepair in the adjacent property). At this early stage of litigation, therefore, Plaintiffs have not shown that their theory of substantial interference based on economic losses, potential closure of their business, and diminished water views is likely to satisfy the substantial and unreasonable interference prong of nuisance under Maryland law.

[17] The Court also heard significant testimony about the steps that Defendants took to notify the community about the Project during its planning phase and Defendants' efforts to install a new bus stop and signage directing patrons to Latitude and nearby businesses during construction. Such evidence goes toward the reasonableness of Defendants' actions, which is not at issue in a private nuisance claim under Maryland law. *See Wash. Suburban Sanitary Comm'n*, 622 A.2d at 758 (explaining that defendant's intent, reasonableness, and negligence are not relevant to substantial and unreasonable interference inquiry under Maryland law, which focuses solely on the disturbance to the plaintiff).

### ii.    Whether Plaintiffs' asserted harm is objectively reasonable

Notwithstanding their failure to establish a likelihood of showing substantial and unreasonable interference with the use of their property under existing caselaw, Plaintiffs likely will be able to show that any adjustments to their use of property are objectively reasonable. Under this second element of nuisance in fact, Maryland courts consider whether the harm claimed is "'objectively reasonable,' in that an ordinary person would be offended or harmed by" it.  *Blue Ink, Ltd.*, 96 A.3d at 97.  Put differently, this prong of the nuisance analysis recognizes that a plaintiff's harm may not result from its hypersensitivity but rather must be one that any objectively reasonable person would experience under the same circumstances. *Schuman v. Greenbelt Homes, Inc.*, 69 A.3d 512, 523 (Md. Ct. Spec. App. 2013) (explaining that a plaintiff fails this prong if the harm arises because "he is peculiarly sensitive").  Thus, plaintiffs with a peculiar sensitivity to smoke, *Schuman*, 69 A.3d at 523–24, or to light, *Blue Ink, Ltd.*, 96 A.3d at 97, have failed to satisfy the objective reasonableness prong.  In this case, however, Plaintiffs have shown that they will likely be able to demonstrate that any adjustment to their use and enjoyment of property based on the October Fence is objectively reasonable and not the result of peculiar sensitivity.

Plaintiffs have shown that the placement of the October Fence immediately abutting their sidewalk has produced a 200-foot, narrow sidewalk path that patrons must take to reach their door and has disrupted views of the water from their first floor.  Additionally, they have established that the disruptions caused by the October Fence will endure until at least June 2027, if not later.  In at least one unpublished opinion, the Appellate Court of Maryland has recognized that prolonged disruptions to access to a property may produce a harm that is

objectively reasonable. *See Mayor & City Council of Havre De Grace v. Pensell*, No. 1746, 2025 WL 2218301, at *18 (Md. App. Ct. Aug. 5, 2025) (concluding private plaintiffs established nuisance where they showed years-long disruptions to their vehicle access to their property). Moreover, Plaintiffs' asserted harms regarding accessibility would apply to any business owner operating in their position such that they do not arise from Plaintiffs' peculiar sensitivity as a restaurant. *Cf. Blue Ink, Ltd.*, 96 A.3d at 96 (harm not objectively reasonable where it arose from drive-in theater business's peculiar sensitivity to light). Accordingly, Plaintiffs have shown that they likely can establish that their harms are objectively reasonable.

Nevertheless, Plaintiffs have not established a likelihood of success on the merits of the private nuisance claim because they have not shown that they will likely establish substantial and unreasonable interference with their use of property. As explained above, there appear to be no cases that have recognized nuisance based solely on economic losses to a business and temporarily diminished views absent a demonstration of diminished property value or physical discomfort. *See, e.g., Albright*, 71 A.3d at 95–96 (suggesting substantial interference requires evidence of "crippling restrictions" on use of property and "minor disturbances and stigma impacts" are not sufficient). In this case, Plaintiffs have not alleged any diminution in the market value of their property or any physical discomfort arising from the October Fence or the related construction. For this reason, they have not shown that they are likely to establish a substantial and unreasonable interference with their use and enjoyment of property within the meaning of Maryland law on private nuisance.[18]

---

[18] Furthermore, Maryland's highest court has "characterize[ed] the doctrine of private nuisance as one which 'balance[s] the conflicting rights of landowners.'" *Wietzke v. Chesapeake Conf. Ass'n*, 26 A.3d 931, 946 (Md. 2011) (quoting *Evans v. Burruss*, 933 A.2d 872, 886 (Md. 2007)). Although this balancing analysis is not well defined

### B. Remaining *Winter* Factors

Although failure to establish any one of the *Winter* factors demands denial of injunctive relief, this Court nonetheless briefly analyzes the remaining factors. *Am. Fed'n of Teachers v. Bessent*, 152 F.4th 162, 169 (4th Cir. 2025) (quoting *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 544 (4th Cir. 2023)). First, Plaintiffs have established that they face irreparable harm absent their requested injunctive relief. A plaintiff seeking a preliminary injunction "must demonstrate more than just a 'possibility' of irreparable harm." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough[.]" *Id.* "The possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm." *Id.* (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)). Ordinarily, therefore, where a plaintiff alleges an unconstitutional taking, injunctive relief is unavailable because such claims are redressable by damages at law. *See Knick v. Township of Scott*, 588 U.S. 180, 201 (2019) ("As long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking.").

---

within the two-prong analysis conducted above and set forth by Maryland courts, this characterization of private nuisance suggests that this Court should balance the goals of the October Fence against those of Plaintiffs. Defendants have established that the October Fence is crucial to nearly $1.1 million of work within the approximately $70 million revitalization Project that intends to protect downtown Annapolis from flooding. Mr. Ligon testified that moving the fence would be detrimental to the project because it would require significant delays and potential resequencing. Plaintiffs' property will benefit from the Project to the extent that it increases property values in the area. Finally, to the extent Plaintiffs seek the return of a fence at the May Fence location to allow vehicle access to the front of Latitude, they appear to request relief that is fundamentally at odds with the finished Project. That is, the Project will prevent any vehicle access to the area in front of Latitude in favor of providing grading and a pedestrian park intended to reduce flooding and draw visitors to the area. Balancing of the City's interests in remodeling public property in downtown Annapolis in a manner that will reduce flooding to nearby business against Plaintiffs' interest in maintaining Latitude further suggests that this case presents a close question such that Plaintiffs have not yet established likelihood of success on the merits of their nuisance claim.

Notwithstanding that Plaintiffs' takings claim may be redressable by just compensation, Plaintiffs have established irreparable harm in the form of loss of customer goodwill and monetary loss so severe as to threaten insolvency. Courts have repeatedly recognized, however, that loss of customer will constitutes irreparable harm for the purposes of injunctive relief. *See Salomon & Ludwin, LLC v. Winters*, 150 F.4th 268, 278 n.7 (4th Cir. 2025) ( "'[P]ermanent loss of customers to a competitor or the loss of goodwill' constitutes irreparable injury." (quoting *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994) *abrogated on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008))). Additionally, where "monetary losses are so severe as to threaten insolvency," there may be irreparable harm. *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 499 (D. Md. 2020) (citing *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994)); *Hughes Network*, 17 F.3d at 694 (noting injunction may be appropriate in "narrow" circumstances where "the moving party's business cannot survive absent a preliminary injunction"). In this case, Plaintiffs offered testimony that banquet customers have explicitly cited the October Fence when cancelling banquet reservations, online customer reviews have cited the construction and fencing in critiques of the restaurant, and customers have commented that they did not realize Latitude was open during the construction. Such testimony is sufficient to establish a loss of customer goodwill as irreparable harm. *Salomon & Ludwin*, 150 F.4th at 278 n.7. Moreover, Plaintiffs' testimony that Latitude's business will not survive absent relief and Latitude's insolvency will cause Landowner Plaintiffs to default on their loans likely also establishes irreparable harm to Plaintiffs. *Ass'n of Cmty. Cancer Ctrs.*, 509 F. Supp. 3d at 499 (citing *Hughes Network Sys.*, 17 F.3d at 694).

38

Next, the balance of the equities and public interest in this case are neutral or slightly favor Plaintiffs.  Considering the balance of the equities, the court must balance the harm to the plaintiff without an injunction against the harm to the defendant if an injunction is granted. *See, e.g.*, *Porretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021).  In this case, the harm that will befall Plaintiffs absent injunction includes layoffs to its employees, closure of its restaurant, default on loans, and insolvency.  Such closure of a successful, local business certainly weighs against the equities and the public interest.  *See, e.g.*, *Carroll Indep. Fuel, LLC v. Raji, Inc.*, 2023 WL 4313120, at *4 (E.D. Pa. July 3, 2023) (collecting cases recognizing that business closures generally weigh against public interest).  Yet, Defendants have established that the requested injunctive relief will be extremely detrimental to a large, ongoing, and fully funded public improvement project that underwent years of community planning and feedback, will prevent flooding, and, ultimately, will benefit Plaintiffs' property.  Thus, the public has a strong interest in seeing the Project continue as planned without significant delay.[19]  *See, e.g.*, *No E.-W. Highway Comm., Inc. v. Chandler*, 767 F.2d 21, 25 (1st Cir. 1985) (recognizing that public interest may favor improvement projects that will improve public safety); *Young v. Harris*, 599 F.2d 870, 879 (8th Cir. 1979) (noting public interest in planned redevelopment).

---

[19]  Separately, Whiting Turner also has an interest in avoiding the costs of relocating the fence and the contractual damages associated with any delay of the project.

## CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Temporary Restraining Order and

Preliminary Injunctive Relief (ECF No. 2) must be DENIED.

A separate Order follows.


Date: March 6th, 2026                                   /s/

                                                       Richard D. Bennett
                                                       United States Senior District Judge